IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                          |   |                                   |
|--------------------------|---|-----------------------------------|
| TRACI D. HALL            | : |                                   |
|                          | : |                                   |
| v.                       | : | Civil Action No. DKC 10-0215      |
|                          | : |                                   |
| BAUSCH & LOMB, INC.      | : |                                   |
|                          | : |                                   |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the motion for summary judgment filed by Defendant Bausch & Lomb, Inc. ("Bausch & Lomb" or "the company") (ECF No. 39). The relevant issues have been briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be granted.

**I.   Background**

**A.   Factual Background**

The following facts are either uncontroverted or taken in the light most favorable to Plaintiff Traci D. Hall. Defendant Bausch & Lomb is a technology-based healthcare company for the eye that conducts business in Maryland, as well as nationally and internationally. The company produces and markets vision care, pharmaceutical, and surgical products. Following a series of interviews in 2003, Bausch & Lomb hired Ms. Hall, an African-

American female who was then thirty-seven years old, as a "Senior Pharmaceutical Sales Specialist," a position referred to interchangeably as "Senior Pharmaceutical Territory Manager."[1] (ECF No. 39-7, Hall Dep., at 19).[2]  The territory initially assigned to Ms. Hall included significant parts of Maryland, ranging from Baltimore to Hagerstown and north almost to Delaware, as well as parts of northern Virginia.  Her primary professional responsibility was to increase market share and product sales for pharmaceutical division products by visiting physicians in this territory, dropping off product samples, and conducting sales presentations and medical education programs to convince these physicians to prescribe the company's products. Administratively, Bausch & Lomb required Ms. Hall to log her physician visits and sample distribution into online databases using a company-issued laptop computer.[3]

---

[1] Prior to being hired into this position, Ms. Hall had worked as a sales representative in three other pharmaceutical companies.  She had also worked briefly in retail management as a store manager.  She did not, however, have any prior experience in pharmaceutical sales management.

[2] In this memorandum opinion, the page numbers are those provided by the ECF system.

[3] As her tenure with the company increased, Ms. Hall attended medical conferences as a Bausch & Lomb representative and informally mentored new sales representatives.

In 2004 and 2005, Ms. Hall received overall performance ratings of "below targets and expectations." (ECF No. 39-4, at 16, 22). The 2004 rating was driven principally by Ms. Hall's low sales numbers.[4] While Ms. Hall's sales performance improved in 2005, her overall rating remained "below expectations" due to problems she experienced with several "Cultural Drivers." (ECF *Id.* at 22). Specifically, the lengthy summary that Mr. Gass appended to the 2005 evaluation emphasized numerous instances in which Ms. Hall had submitted incomplete, inaccurate, or untimely reports, failed to follow up with key physicians in her territory, and provided inconsistent communications to management. Ms. Hall refused to sign this evaluation because she disagreed with Mr. Gass's assessment.

The company realigned Ms. Hall's territory in March 2006. This realignment process, described by Ms. Hall as "very common," resulted in the addition of Fredericksburg, Virginia, and other parts of Virginia to her territory, and the removal from her territory of the area from Baltimore to Hagerstown, Maryland. (ECF No. 39-7, at 39). Although the new territory

---

[4] Dean Gass, the Regional Business Director ("RBD") for the upper Mid-Atlantic region and Ms. Hall's manager, stated in this evaluation that Ms. Hall had met company expectations with regard to "Cultural Drivers," which encompassed areas such as "external focus," "personal accountability," and self-productivity. (*Id.* at 15).

3

"was tougher" for Ms. Hall because it required her to "deal[]
with [more] traffic congestion" (*id.* at 40), her 2006
performance rating improved to "meets targets and expectations,"
with Troy Stribling, the new RBD for her region, concluding that
"Traci had a fantastic year" and did a "[g]reat job in 2006"
(ECF No. 39-4, at 29).

When Mr. Stribling announced his departure in the late
summer or early fall of 2007, Bausch & Lomb announced a vacancy
in this RBD position and solicited applications via an internal
job posting and external advertisements.  The qualifications for
the RBD position were stated as follows:

> BA/BS Required – MBA Preferred.  10+ years
> sales experience and prior pharmaceutical
> sales management experience preferred.
> Strong analytical skills required.  Computer
> skills, strong written and verbal
> communication skills, prior experience in
> Marketing a plus, prior technology and or
> medical training a plus.

(*Id.* at 2).  Company policy also required current sales
representatives to have served in their territories for two
years in order to be eligible for the promotion.  Bausch & Lomb
received 136 applications, including one from Ms. Hall, for the
RBD position.  The recruiting and hiring committee, which
included Maria Martinez, the Director of Human Resources, and
Michael O'Rourke, the Vice President and General Manager of the
company's national pharmaceuticals division, reviewed the

applications for each candidate as well as the performance evaluations for all internal applicants. Six applicants were selected for interviews: Kelly Haderer,[5] Marc Newman, Jeff LeFevre, Jeff Rheault, Glen DeBoey, and George Ajaj. Ms. Haderer, a Caucasian female, was the only external applicant selected for an interview. She had more than six years of pharmaceutical sales management experience "and even had experience opening and running her own business for approximately one year prior to her application for the [RBD] position." (ECF No. 39-3, Martinez Aff., ¶ 16).[6] Mr. O'Rourke notified Ms. Hall that she had not been selected for an interview because her sales numbers "were bad." (ECF No. 39-7, at 36).[7] He also indicated that he wanted to place Ms. Hall on a

---

[5] Ms. Haderer's last name has since changed to Curia. For purposes of this memorandum opinion, however, the court – like the parties – will refer to her using her last name during the period relevant to Ms. Hall's claims.

[6] Mr. Newman, a Caucasian male over the age of forty – and older than Ms. Hall - and Mr. LeFevre, a Caucasian male under the age of forty, were selected for an interview based on their extensive management experience, performance ratings of "exceeds targets and expectations," and receipt of numerous performance and recognition awards during their tenure with Bausch & Lomb. (*Id.* ¶¶ 11-14). Mr. LeFevre, however, had only worked for the company for approximately twenty months at the time he submitted his application.

[7] Ms. Martinez stated that the company did not select Ms. Hall for an interview due to her general lack of management

5

"development plan to get [her] promoted as fast as possible."
(*Id.*).   According to Ms. Hall, no such plan was ever
implemented.   Ultimately, following interviews with each of the
six selected candidates, Bausch & Lomb selected Ms. Haderer as
RBD for the upper Mid-Atlantic region.

Ms. Haderer began working in this position in October 2007.
On October 16, 2007, during a one-on-one conference call between
Ms. Hall and Ms. Haderer, Ms. Hall mentioned that she was
experiencing ongoing problems with her company-issued computer
and that she had been unable to enter her physician visits into
the company's online database.[8]   Ms. Haderer informed Ms. Hall
that the company still expected her to find a way to enter the
physician visit information into the database.   When Ms. Hall
had still only entered a limited number of physician visits into
the system several weeks later, despite the apparent resolution
of her computer problems in the interim, Ms. Haderer asked Ms.
Hall to provide an update on the situation and offered to
contact the information technology department personally to
resolve the issue.   When Ms. Hall's computer problems continued,

experience and the inconsistency in her job performance from
2004-2006.

[8] During her tenure with Bausch & Lomb, Ms. Hall received at
least three replacement computers, each of which had numerous
technical problems and frequently crashed.

she fell behind on her administrative tasks and often had to use her "personal time" to finish work she would have otherwise completed during business hours. (*Id.* at 49). At one point, when discussing these delays with Ms. Hall, Ms. Haderer suggested that Ms. Hall had sabotaged her laptop by "throwing it down." (*Id.* at 43).

On November 14, 2007, Ms. Haderer accompanied Ms. Hall on her physician visits as part of a field coaching program. Following this field visit, Ms. Haderer prepared a detailed report documenting the day. The report emphasized strengths in Ms. Hall's presentation skills and customer interactions, but it critiqued her use of an outdated visual aid and difficulty in locating one physician's office. The report also discussed the fact that Ms. Hall consistently failed to submit timely and accurate reports about her sales visits and sample distribution. Finally, the report scolded Ms. Hall for violating company policy and pharmaceutical industry guidelines by purchasing a baby gift for a physician in her territory using company funds.

Ms. Hall responded to the report, acknowledging that many of her own reports had been submitted late; she maintained, however, that ongoing computer problems were the reason for the delay. She also insisted that she had only purchased the baby gift after receiving approval from an employee in the finance

department.   That employee subsequently admitted providing Ms.
Hall with erroneous advice on this issue.   Around this time, Ms.
Hall contacted Ms. Martinez and informed her that Ms. Haderer's
continuing criticism was creating a hostile work environment for
her.[9]  "Nothing was done" in response to this complaint.   (ECF
No. 39-7, at 52).

When Ms. Hall's computer problems continued into December
2007, Ms. Haderer began requiring her to submit an itemized list
of physician visits and sample distributions on a weekly basis
until the company could "be 100 percent confident that [her]
computer [was] up and running properly on a consistent basis."
(*Id.* at 50).   This requirement essentially served as a
substitute method for entering the same information in the
company's online databases.   Ms. Hall frequently submitted these
weekly faxes in an untimely manner.   Ms. Haderer also requested
that Ms. Hall provide her with documentation about the days that
she had taken vacation during 2007 due to discrepancies in
certain sample reports.   Ms. Hall did not respond promptly to
this request and, when she did respond, she told Ms. Haderer
that she could not easily access this information.   The

--------

[9] The parties dispute whether Ms. Hall informed Ms. Martinez
that she believed this harassment was motivated by race or any
other category protected by federal law.

relationship between Ms. Hall and Ms. Haderer continued to deteriorate after this point.

Early in 2008, Ms. Hall sought emergency medical treatment after experiencing numbness, tingling, and pain in her left side.  One of Ms. Hall's friends contacted Ms. Haderer to inform her that Ms. Hall was unable to come to work, and Ms. Haderer then told the company's human resources department about Ms. Hall's illness and hospitalization.  After her physician advised her not to return to work during the duration of this undiagnosed illness, Ms. Hall submitted a claim for disability benefits.  On February 22, 2008, Ms. Martinez notified Ms. Hall that the company's insurer had denied her disability benefits claim, but stated that she could apply for leave under the Family Medical Leave Act ("FMLA") if she submitted the necessary paperwork by the close of business on March 4, 2008.[10]  Ms. Martinez indicated that Ms. Hall's absence would be considered unauthorized, possibly resulting in disciplinary action, if she did not return this paperwork in a timely manner.  Ms. Hall requested additional information on the evening of March 4, and

---

[10] While Ms. Hall was on FMLA leave, her territory was again realigned to include West Virginia.  To accommodate this addition, Ms. Hall's responsibilities to physician offices in Maryland were reduced.  During her deposition, Ms. Hall indicated that she was only disputing the March 2006 realignment in this action.  (ECF No. 39-7, at 40).

submitted the required paperwork two days later.  Bausch & Lomb then approved her request for FMLA leave through April 14, 2008.

On April 11, 2008, Laura Long, a disability case manager for Bausch & Lomb, attempted to contact Ms. Hall about the impending expiration of her FMLA leave.  Ms. Hall called Ms. Long later that day and stated that her physician had instructed her not to return to work for another two weeks.  Ms. Long asked Ms. Hall to submit additional medical documentation, but Ms. Hall never did so.  The company's FMLA leave policy explicitly provides that "[e]mployees failing to return to work on the day following the end of leave will be treated as having resigned their job, and will be terminated." (ECF No. 39-5, at 42).  On April 18, 2008, Ms. Martinez faxed a letter to Ms. Hall informing her that Bausch & Lomb "assum[ed]" that she had abandoned her position by failing to submit any medical documentation regarding an FMLA leave extension and that her employment status would be converted to "terminated" the following day.  (ECF No. 44-1, at 71).[11]

Ms. Hall subsequently submitted expense reports to the company for various unreimbursed expenses on her company credit

---

[11] Two days earlier, in response to a request from Ms. Martinez, Ms. Haderer submitted a "timeline of communications" documenting her communications with Ms. Hall since joining Bausch & Lomb.  (ECF No. 44-1, at 66-69).

card.   She submitted receipts to substantiate these expenses, but Bausch & Lomb contended that it never received them. Accordingly, it refused to reimburse Ms. Hall for these expenses.

### B.   Procedural Background

On May 1, 2008, Ms. Hall filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   That charge stated, in pertinent part, as follows:

> In September 2007, I was denied an interview for the position of Regional Business Director.   On November 14, 2007, I was subjected to harassment and falsely accused of sabotaging the laptop computer and this employer changed my territory which lowered my rating. . . . I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964 . . . with respect to my race, Black, and the Age Discrimination in Employment Act of 1967 because of my age (41), with respect to promotion and harassment.

(ECF No. 39-7, at 2).   After investigating Ms. Hall's allegations, the EEOC issued a Dismissal and Notice of Rights on October 28, 2009.   The form explained that, "[b]ased upon [the] investigation, the EEOC [was] unable to conclude that the information obtained establish[ed] violations of the statutes." (ECF No. 39-7, at 4).

On January 27, 2010, Ms. Hall commenced this action by filing a multi-count complaint against Bausch & Lomb, asserting

violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, for hostile work environment, wrongful termination, and retaliation.   The complaint also mentioned a claim for "[n]on payment of [c]orporate [e]xpenses." (ECF No. 1, at 6).   On May 28, 2010, Bausch & Lomb moved to dismiss.   Approximately two weeks later, Ms. Hall filed an amended complaint, setting forth claims of wrongful termination, failure to interview, and hostile work environment on the basis of race under Title VII and 42 U.S.C. § 1981, and claims of wrongful termination and failure to interview on the basis of age under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*   The amended complaint also asserted a claim for breach of contract stemming from her unreimbursed corporate expenses.   (ECF No. 17).[12]   The company's motion to dismiss the original complaint was subsequently terminated as moot, Defendant answered the amended complaint, and the court entered a scheduling order.

Following discovery, on November 4, 2011, Bausch & Lomb filed a motion for summary judgment.   (ECF No. 39).   Ms. Hall opposed the motion.   Bausch & Lomb has replied to Ms. Hall's opposition.

---

[12] Original jurisdiction over the case was based on the federal questions set forth in the amended complaint.

## II.  Standards of Review

Bausch & Lomb has moved for summary judgment as to each of Ms. Hall's claims.  A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  At the same time, the court must

construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

As to the breach-of-contract claim, Bausch & Lomb has also moved to dismiss for lack of supplemental jurisdiction. The party bringing suit in federal court bears the burden of proving that subject matter jurisdiction properly exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (noting that the plaintiff generally bears this burden); *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008) (stating that a party seeking to remove a case to federal court must demonstrate subject matter jurisdiction). In a 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), *cert. denied*, 503 U.S. 948 (1992); *see also Evans*, 166 F.3d at 647. The court should grant a 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768.

III. **Analysis**

   A.   **Summary Judgment Is Warranted in Bausch & Lomb's Favor as to Ms. Hall's Employment Discrimination Claims**

Ms. Hall alleges violations of Title VII, the ADEA, and § 1981 in her amended complaint.  Bausch & Lomb has presented multiple grounds for summary judgment as to each of these claims.  Two of these arguments – failure to exhaust administrative remedies and timeliness – affect which factual allegations the court may consider in resolving Ms. Hall's Title VII and ADEA claims, but they do not change the scope of allegations that may be considered with regard to the § 1981 claims.  Therefore, in resolving the presently pending motion, Ms. Hall's Title VII and ADEA claims will be analyzed separately from her § 1981 claims.

   1.   **Title VII and ADEA Claims**

Bausch & Lomb has moved for summary judgment as to Ms. Hall's Title VII and ADEA claims on three grounds.  First, the company contends that certain of Ms. Hall's claims and factual allegations are barred for failure to exhaust administrative remedies or to submit a timely EEOC charge of discrimination.  Second, Bausch & Lomb asserts that the properly considered allegations, even when supported by evidence, fail to establish a *prima facie* case of employment discrimination.  Third, the company argues that a legitimate, non-discriminatory reason

15

existed to support its decision not to interview Ms. Hall for the RBD position.   Ms. Hall has generally opposed these arguments, contending that material disputes of fact make summary judgment improper on her Title VII and ADEA claims.

### a.    Failure to Exhaust Administrative Remedies

Both Title VII and the ADEA require a plaintiff to file a charge of discrimination with the EEOC prior to filing suit in federal court.  *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009).   Although the EEOC charge defines the scope of the right to file a subsequent civil suit, the initial administrative complaint does not create strict, impenetrable limits on those subsequent rights.   Rather, the scope of the civil action is confined to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation [of that complaint]."   *Thorn v. Sebelius*, 766 F.Supp.2d 585, 596 (D.Md. 2011) (quoting *Jones*, 551 F.3d at 300), *aff'd*, 465 F.App'x 274 (4th Cir. 2012) (unpublished opinion).

Civil suits may not, however, present entirely new factual bases or entirely new theories of liability from those set forth in the initial EEOC complaint.   *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963-64 (4th Cir. 1996) (concluding that a plaintiff was barred from litigating a sexual harassment claim

where her EEOC charge included only a claim for failure to promote based on gender); *Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863-64 (4th Cir. 1982) (finding failure to exhaust where a plaintiff had alleged a discriminatory layoff claim in his EEOC complaint, but presented a discriminatory failure to rehire claim in formal litigation).  Thus, a plaintiff fails to exhaust her claims when "[her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

Here, the amended complaint presents a theory of liability not set forth in Ms. Hall's EEOC charge.  The EEOC charge did not allege wrongful termination as a basis for discrimination; in fact, despite being filed approximately two weeks after Ms. Hall's employment with Bausch & Lomb ended, it did not even mention her termination.  Accordingly, Ms. Hall failed to exhaust her administrative remedies with regard to this theory of liability, and it will not be considered in resolving her Title VII and ADEA claims.  *Chacko*, 429 F.3d at 509.

Bausch & Lomb contends that Ms. Hall also failed to exhaust administrative remedies with regard to several factual allegations in her racial harassment claim under Title VII. Specifically, the company emphasizes that the only incidents of

"harassment" mentioned in the EEOC charge were the March 2006 territory realignment and Ms. Haderer's alleged statement accusing Ms. Hall of sabotaging her laptop computer.   This argument, however, overlooks the fact that the "new" allegations in the amended complaint (i.e., the criticisms of Ms. Hall's performance in the field coaching report and the requirement that she submit weekly reports regarding physician visits and sample distribution by fax) were "reasonably related to the original complaint" and likely would have been "developed by reasonable investigation" of that complaint. *Jones*, 551 F.3d at 300.   Indeed, these allegations all involved Ms. Haderer, occurred around the same time as her laptop sabotage accusation, and generally involved her response to Ms. Hall's perceived organizational and administrative performance deficiencies. Because these factual allegations referenced the same actor, time frame, and type of conduct as those set forth in Ms. Hall's EEOC charge, the investigation of her EEOC charge likely would have "uncovered" them. *Chacko*, 429 F.3d at 506-09; *see also Thorn*, 766 F.Supp.2d at 596-97 (concluding that a plaintiff had exhausted his remedies as to facts mentioned for the first time in his complaint because those facts "all relate[d] to the same fundamental theme" discussed within his EEOC charge).   They are, therefore, properly before the court and may be considered in

resolving Ms. Hall's hostile work environment claim under Title VII.

  **b.   Failure to File a Timely EEOC Charge Regarding the March 2006 Territory Realignment**

Bausch & Lomb next contends that the court may not consider the territory realignment when resolving Ms. Hall's Title VII and ADEA claims because she did not file a timely EEOC charge addressing this event.[13] Both statutes require a plaintiff to file an EEOC charge within a prescribed limitations period. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B). In deferral states such as Maryland, that limitations period is 300 days from the date of the allegedly discriminatory act. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B); *see also Jones*, 551 F.3d at 300. Ms. Hall concedes that she did not file her EEOC charge within 300 days of the March 2006 territory realignment.

She argues, however, that "to successfully bring a hostile work environment claim, an employee need only show that one of the underlying allegations occurred within the statutory period." (ECF No. 44, at 7). According to Ms. Hall, because the accusation about sabotaging her laptop occurred within 300

---

[13] Although a cursory reading of Ms. Hall's EEOC charge suggests that the challenged territory realignment may have occurred on November 14, 2007, Ms. Hall stated in her deposition that the realignment she contested in the EEOC charge occurred in March 2006.

days of the time that she filed her EEOC charge, her hostile work environment claim may also include the March 2006 territory realignment, even though it occurred outside that 300-day window.[14]

The Supreme Court of the United States has recognized this "continuing violation" doctrine in limited circumstances involving employment discrimination actions. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Indeed, although the Court concluded that discrete discriminatory acts are not actionable if they occur outside the statutory limitations periods, it set forth a more lenient principle with regard to incidents underlying hostile work environment claims. *Id.* at 113, 115. Because the harassment that leads to a hostile work environment "occurs over a series of days or perhaps years," an EEOC charge referencing events outside the statutory time period will be considered timely as long as those events "are part of the same actionable hostile work environment practice" as events occurring within the limitations period. *Id.* at 115, 118-20. In determining whether events beyond the statutory period satisfy this test, courts are advised to

---

[14] In setting forth this argument, Ms. Hall acknowledges *sub silentio* that she cannot pursue an independent discrimination claim under Title VII or the ADEA with regard to the March 2006 territory realignment.

consider whether "the pre- and post-limitations period incidents involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers."  *Id.* at 120–21 (internal quotation marks omitted); *see also Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 951 (8th Cir. 2011) (considering similar factors).

Assuming *arguendo* that the March 2006 territory realignment is not a discrete discriminatory act precluding application of the continuing violation doctrine,[15] Ms. Hall has not demonstrated that it is part of the "same actionable hostile work environment" she purportedly faced in the fall of 2007, the time period at issue in her EEOC charge.  The March 2006 realignment was a one-time corporate decision that altered Ms. Hall's sales territory, an event dissimilar in nature from Ms. Haderer's ongoing criticism of her organizational and administrative performance deficiencies during the fall of 2007.

---

[15] This conclusion is hardly free from doubt.  Indeed, other courts have held that an unfavorable job assignment is a discrete act that "cannot form the basis for a continuing violation claim."  *E.g.*, *Gross v. Nat'l Broadcasting Co., Inc.*, 232 F.Supp.2d 58, 68–69 (S.D.N.Y. 2002) (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2[d] Cir. 1997)); *see also Chennareddy v. Dodaro*, 698 F.Supp.2d 1, 13–14 (D.D.C. 2009) (concluding that a plaintiff could not invoke the continuing violation theory to "bootstrap" discrete discriminatory acts into a broader claim for hostile work environment (citing *Rattigan v. Gonzales*, 503 F.Supp.2d 56, 80–82 (D.D.C. 2007))), *aff'd*, 2010 WL 3199827 (D.C. Cir. Aug. 10, 2010) (unpublished opinion).

The EEOC charge does not mention any intervening incidents of harassment during the nineteen-month period between these events.  The territory realignment also occurred during Mr. Gass's tenure as RBD of the upper Mid-Atlantic region, indicating that these events involved different supervisors.  In fact, Ms. Haderer did not begin working for Bausch & Lomb until roughly eighteen months after the realignment occurred.

These differences illustrate that there is little – if any – relationship between these events and that they do not compose the "same actionable hostile work environment." *See, e.g.*, *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 74-78 (2[d] Cir. 1020) (reaching the same conclusion about a "sleep-over comment" that occurred following an employee's transfer to a different department (internal quotation marks omitted)); *Duncan v. Manager, Dep't of Safety, City and Cnty. of Denver*, 397 F.3d 1300, 1308-10 (10th Cir. 2005) (holding that pre- and post-limitations period events did not involve the same hostile work environment where several years had passed between the events and the type of harassment, occurring under different supervisors, had changed from physical and psychological threats to off-color comments); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 376-77 (6th Cir. 2002) (reasoning that a plaintiff could not invoke the continuing violation doctrine where the two

acts at issue were unrelated in nature and separated by a period of eight months).  As a result, Ms. Hall's EEOC charge was untimely as to the March 2006 territory realignment, and that event will not be considered in analyzing the merits of her racial harassment claim under Title VII.

c.   **Failure to Interview**

Due to the procedural deficiencies in Ms. Hall's termination and territory realignment allegations, the only discrete act at issue with regard to the Title VII and ADEA claims is the company's decision not to interview Ms. Hall for the RBD position.  Although failure to interview would generally encompass the failure to hire or promote, *Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 14 (1st Cir. 2012), Ms. Hall has expressly decoupled those events here.  Indeed, in her amended complaint, she stated that Bausch & Lomb's failure to *interview* her for this position evinced discrimination on the basis of race and age because two of the individuals selected for interviews – but not ultimately hired for the RBD position – were Caucasian and under forty years old.[16]  She did not contend that the company's selection of Ms. Haderer as RBD was discriminatory or indicate that she contested its ultimate

---

[16] The evidence subsequently revealed that Mr. Newnan, one of these individuals, was over forty – and older than Ms. Hall – at the time of his selection as an interview candidate.

decision not to *promote* her to RBD.   During her deposition, Ms.
Hall even reiterated that she was challenging "[o]nly" the fact
that she did not receive an interview, not the fact that she did
not receive a promotion as a result the company's decision not
to interview her.   (ECF No. 39-7, at 34) ("Q:  .  .  .  Are you
alleging race discrimination and age discrimination based on not
getting the position?   A:   No.   Only not receiving an
interview.").   On this basis, Bausch & Lomb asserts that Ms.
Hall cannot prevail on her failure-to-interview claim because
she did not suffer an adverse employment action.

To set forth a discrimination claim on the basis of race or
age, a plaintiff must demonstrate that she suffered an adverse
employment action.   *Coleman v. Md. Court of Appeals*, 626 F.3d
187, 190 (4th Cir. 2010) (race discrimination), *aff'd on other
grounds*, 132 S.Ct. 1327 (2012); *Warch v. Ohio Cas. Ins. Co.*, 435
F.3d 510, 513 (4th Cir. 2006) (age discrimination); *Bristow v.
Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("The
employment   discrimination   laws   require   as   an   absolute
precondition to suit that some adverse employment action have
occurred.").   Not every workplace dispute involves an adverse
employment action.   Indeed, to qualify as an adverse action, a
discriminatory act must result in "a significant change in
employment status," *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

24

742, 761 (1998), by "adversely affect[ing] the terms, conditions, or benefits of the plaintiff's employment," *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004); *Thorn*, 766 F.Supp.2d at 598. "Lesser interlocutory or mediate decisions" generally do not rise to the level of adverse employment actions. *Axel v. Apfel*, 171 F.Supp.2d 522, 526-27 (D.Md. 2000) (internal quotation marks omitted), *aff'd*, 118 F.App'x 677 (4th Cir. 2004).

Here, Ms. Hall's failure-to-interview claim lacks such a tangible employment action. Circumscribing her claim to focus only on the company's decision not to interview her, rather than its decision not to promote her, Ms. Hall fails to identify any "significant detrimental effect" stemming from this interlocutory decision. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (noting that "[t]here must be some significant detrimental effect" resulting from a discriminatory act for that act to constitute an adverse employment action). This situation is analogous to circumstances in which a plaintiff contends only that she has received a negative performance evaluation. A poor evaluation is actionable only where the plaintiff demonstrates that the evaluation somehow negatively affected the terms and conditions of her employment. *James*, 368 F.3d at 377-78. In the absence of such evidence, a

poor performance evaluation does not constitute an adverse employment action. *Id.* Similar reasoning is instructive in the present case. By choosing to contest only her non-selection for the RBD interview, rather than her ultimate lack of promotion to the RBD position, Ms. Hall has failed to demonstrate that she suffered an adverse employment action. *E.g.*, *Cook v. Caldera*, 45 F.App'x 371, 377 (6th Cir. 2002) (reasoning that an employer's failure to select the plaintiff for an interview was not, in itself, an adverse action).

Ms. Hall attempts to avoid the force of Bausch & Lomb's persuasive argument by suggesting in her opposition papers that the crux of her claim is actually the company's failure to *promote* her to the RBD position, rather than its decision not to select her for an interview. She also baldly asserts – for the first time – that she may have outperformed Ms. Haderer during the interview process if the company had chosen her as an interview candidate. These arguments are unavailing for two reasons. First, "a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F.Supp.2d 399, 436 (D.Md. 2006) (citing *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)). A plaintiff seeking to amend the complaint at the summary judgment stage must follow

the procedures set forth in the Federal Rules of Civil Procedure. *Id.* (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004)). Ms. Hall failed to do so here, as she never sought to amend her complaint to include the allegations on which she now seeks to rely.

Second, Ms. Hall conceded during her deposition that Bausch & Lomb had a legitimate, non-discriminatory reason for selecting Ms. Haderer to fill the RBD position. When asked whether she disputed the company's selection of Ms. Haderer, she emphasized that she was "not disputing that at all" because Ms. Haderer "ha[d] more years of experience in management" than she did. (ECF No. 39-7, at 33-34). This concession is fatal to Ms. Hall's newly-introduced allegations regarding failure to promote. *See Ham v. Wash. Suburban Sanitary Comm'n*, 158 F.App'x 457, 476 (4th Cir. 2005) (explaining that a plaintiff had "deal[t] a fatal blow" to his failure-to-promote claim when admitting that he would have chosen the selected employee for an open position if he had been the hiring manager). Accordingly, summary judgment in Bausch & Lomb's favor is warranted on this claim.

### d.   Hostile Work Environment

Ms. Hall also contends that she endured racial harassment during her tenure at Bausch & Lomb. Because she failed to file

a timely EEOC charge with regard to the March 2006 territory realignment, the only remaining allegations of harassment relate to Ms. Haderer's repeated criticism of her performance during the fall of 2007.  A plaintiff can prevail on a claim for racial harassment only where she can show that the unwelcome conduct she faced was based on her race and was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Khoury v. Meserve*, 268 F.Supp.2d 600, 612 (D.Md. 2003), *aff'd*, 85 F.App'x 960 (4th Cir. 2004). Ms. Hall wholly fails to make either showing, and her hostile work environment claim under Title VII must, therefore, fail.

First, Ms. Hall fails to demonstrate that race motivated any of Ms. Haderer's criticisms of her performance deficiencies. It is axiomatic that a plaintiff's mere speculation as to racial animus will not suffice to prove that she faced unwelcome conduct on the basis of race; concrete evidence of animus is required.  *See, e.g., Nicole v. Grafton Sch., Inc.*, 181 F.Supp.2d 475, 482-93 (D.Md. 2002); *Sonpon v. Grafton Sch., Inc.*, 181 F.Supp.2d 494, 500 (D.Md. 2002); *cf. Evans*, 80 F.3d at 959 (explaining that a plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case of

[]discrimination" (alteration in original) (internal quotation marks and citations omitted)).   Here, Ms. Hall offers nothing more than speculation to support her racial harassment claim. When asked during her deposition why she believed that Ms. Haderer's criticisms related to her race, Ms. Hall stated only that she "felt singled out" and "like she was [being] target[ed] and pick[ed] on" by Ms. Haderer.   (ECF No. 39-7, at 43-44, 49-50).   Her entire case for harassment is based on her own conclusory allegations that race drove Ms. Haderer's conduct. These unsubstantiated allegations, however, are patently insufficient to prove "a linkage between the hostile behavior and [her] membership in a protected class."   *Douglas-Slade v. LaHood*, 793 F.Supp.2d 82, 101 (D.D.C. 2011) (internal quotation marks omitted).

Second, the events set forth by Ms. Hall – the accusation about sabotaging her laptop, the criticisms presented in the field coaching report, and the requirement that she submit weekly faxes regarding physician visits and sample distribution – are far afield from the "extreme" conduct necessary to constitute actionable harassment.   *Karim v. Staples, Inc.*, 210 F.Supp.2d 737, 752-53 (D.Md. 2002), *appeal dismissed*, 60 F.App'x 999 (4th Cir. 2003).   Indeed, these "instances of 'harassment' . . . hardly constitute harassment at all."   *Thorn*, 766 F.Supp.2d

at 601.   From an objective viewpoint, they amount to instances where she disagreed with Ms. Haderer's management style and methods – "and that alone is not actionable under Title VII." *Id.; Douglas-Slade*, 793 F.Supp.2d at 101.

"Workplaces are not always harmonious locales," *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal quotation marks omitted), and "[p]ersonality conflicts and questioning of job performance are unavoidable aspects of employment," *Hawkins*, 203 F.3d at 282 (internal quotation marks and citation omitted).   The incidents presented by Ms. Hall - if accepted as sufficiently pervasive or severe to be actionable harassment – "would countenance a federal cause of action for mere unpleasantness." *Chacko*, 429 F.3d at 512 n.3 (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)).   This, of course, is not permissible, and judgment in Bausch & Lomb's favor is thus warranted with regard to Ms. Hall's hostile work environment claim.   *See Hawkins*, 203 F.3d at 281-82 (affirming summary judgment to an employer where the evidence showed merely that the plaintiff had to repeat work and work late in order to complete assignments and that the supervisor questioned the plaintiff about her performance); *see also Combs-Burge v. Rumsfeld*, 170 F.App'x 856, 862 (4th Cir. 2006) (affirming the district court's grant of summary judgment

to an employer where the events underlying a hostile work environment claim involved counseling about performance deficiencies and assignment of some additional tasks).

## 2.   § 1981 Claims

Ms. Hall also presents claims for failure to interview, racial harassment, and wrongful termination pursuant to § 1981. Section 1981 claims are not subject to the same exhaustion and timeliness requirements as those made under Title VII and the ADEA. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291-92 (4th Cir. 2004). Rather, as long as the facts at issue in the action occurred within four years of the time that the plaintiff filed her complaint in federal court, those facts may be considered in resolving her § 1981 claims. *Id.* at 292. All of the incidents in Ms. Hall's complaint – including her March 2006 territory realignment[17] and termination - took place within this four-year window. The court may, therefore, consider them here.

_____

[17] Ms. Hall has not contended that this realignment could serve as the basis of an independent discrimination claim under § 1981. Even if she had made such an argument, it would fail because there is no evidence that the territory realignment qualifies as an adverse action. *James*, 368 F.3d at 376 (reasoning that an unappealing job assignment does not, in itself, constitute an adverse employment action); *see also Holland*, 487 F.3d at 219 (concluding that a reassignment was not an adverse action where the plaintiff merely asserted that it "would have been more difficult" for him to perform his job but offered no evidence in support of that assertion). Ms. Hall worried that the March 2006 realignment would affect her

The framework that governs Title VII claims also governs §
1981 claims. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir.
2004) ("[T]he elements required to establish such a
[circumstantial] case [of discrimination] are the same under
[both] statutes."). As a result, Ms. Hall's failure-to-
interview and racial harassment claims fail here for the same
reasons that those claims failed under Title VII.[18]

Although Ms. Hall's wrongful termination claim may be
considered under § 1981, it ultimately fails. In wrongful
termination claims under § 1981, like under Title VII, the
burden shifts to the employer to provide a legitimate, non-
discriminatory reason for the plaintiff's termination after the
plaintiff has set forth a *prima facie* case. *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Dang v. Inn at*

---

productivity, but the record is devoid of any evidence
substantiating this concern. In fact, following this
realignment, Ms. Hall's performance rating actually improved
from the prior year.

[18] Unlike the Title VII claim, the § 1981 claim for racial
harassment would include the March 2006 territory realignment.
This minor alteration, however, does not enable Ms. Hall to set
forth a *prima facie* case for harassment because the record is
still devoid of any evidence that the realignment was racially
motivated. Ms. Hall conceded as much during her deposition.
(ECF No. 39-7, at 40).

*Foggy Bottom*, 85 F.Supp.2d 39, 42-43 (D.D.C. 2000).[19]   If the defendant makes this showing, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason for her termination was pretextual.   *McDonnell Douglas Corp.*, 411 U.S. at 802-03.   Here, Bausch & Lomb contends that a legitimate, non-discriminatory reason existed for Ms. Hall's termination:   her FMLA leave had expired, she had not returned to work, and she had failed to provide any medical documentation to support the extension of this leave.   Ms. Hall presents two arguments in response.   First, she contends that much of the documentation Bausch & Lomb submitted in support of its decision for terminating her – notably, Ms. Long's communications to her and Ms. Martinez about FMLA leave expiration – is hearsay and, therefore, may not be considered in resolving the summary

---

[19] Bausch & Lomb initially contends that Ms. Hall "cannot establish a *prima facie* case" for wrongful termination because she has no evidence "giving rise to an inference of race discrimination."  (ECF No. 39-9, at 38).  As support for this argument, the company cites a portion of Ms. Hall's deposition testimony in which she was unable to identify specific evidence supporting her contention that race discrimination prompted her termination.  In opposition, Ms. Hall responds that "she is proceeding under the circumstantial *McDonnell Douglas* framework," not – as she apparently interprets Bausch & Lomb to suggest – a direct evidence framework.  (ECF No. 44, at 13). The company's reply then contends that Ms. Hall's failure to set forth any such "circumstantial" evidence merits judgment in its favor.  Because Ms. Hall understood Bausch & Lomb to challenge only her lack of *direct* evidence of wrongful termination, however, her failure to set forth evidence supporting a *prima facie* case is not fatal to her claim.

33

judgment motion.   Second, she suggests that her leave expiration was merely a pretext for her termination.   Both of these arguments are without merit.

Ms. Hall's hearsay argument fails on two fronts.   As an initial matter, it is not clear that her objection is proper because she does not argue that Bausch & Lomb *cannot* produce an admissible version of this evidence at trial.   Rule 56(c)(2) was amended in 2010 to provide that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."   Thus, "the objection [now] contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Ridgell v. Astrue*, No. DKC 10-3280, 2012 WL 707008, at *9 (D.Md. Mar. 2, 2012) (quoting *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D.Mich. Oct. 31, 2011)).   Even assuming that Ms. Hall's objection was proper, however, she waived it with regard to Ms. Long's emails about her FMLA leave expiration by relying on those very communications in her opposition.   (*Compare* ECF No. 39-5, at 45, *with* ECF No. 44, at 63); *cf. Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998) (holding that the defendant waived its hearsay objection to evidence proffered by the plaintiff in opposition to a motion for summary judgment

where the defendant submitted the same evidence in support of its own prior motions).

Ms. Hall's argument about pretext also fails. Citing company policy, Bausch & Lomb asserts that Ms. Hall abandoned her position by failing to return to work following the expiration of her FMLA leave or to provide any documentation justifying an extension of her medical leave beyond April 14, 2008. Ms. Hall does not contest her failure to return to work on April 14, 2008, or her failure to provide such documentation. In light of these undisputed facts, the company has proffered a legitimate, non-discriminatory reason for Ms. Hall's termination, *Austin v. Fuel Sys., LLC*, 379 F.Supp.2d 884, 903 (W.D.Mich. 2004) ("An employee may be terminated for failing to return to work after her FMLA leave has expired."); *see also Anderson v. Dunbar Armored, Inc.*, 678 F.Supp.2d 1280, 1311 (N.D.Ga. 2009) (concluding that defendants had satisfied their burden of producing a legitimate, non-discriminatory reason for filling the plaintiff's position after her FMLA leave had expired), and the burden shifts back to her to demonstrate pretext.

"[A] plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Smith v.*

*Vilsack*, 832 F.Supp.2d 573, 584 (D.Md. 2011) (quoting *Hobbs v. City of Chi.*, 573 F.3d 454, 462 (7th Cir. 2009)). Here, Ms. Hall wholly fails to do either. Indeed, her only "evidence" of pretext is an email that Ms. Haderer sent to Ms. Martinez on April 16, 2008, two days prior to her termination, documenting Ms. Hall's frequent failures to communicate with Ms. Haderer. According to Ms. Hall, this email raises a genuine dispute of material fact regarding Ms. Haderer's involvement in the decision to terminate her employment. At the outset, it is unclear why Ms. Haderer's involvement in Ms. Hall's termination matters at all, particularly as the company did not discuss Ms. Haderer's role – or lack thereof - in the termination decision at any point in its motion papers. Additionally, even assuming that Ms. Haderer knew about Ms. Hall's impending termination, her email does nothing to cast doubt on Bausch & Lomb's asserted reason for terminating her. If anything, it reinforces the ongoing communication problems that the company was experiencing with Ms. Hall and emphasizes that she had – once again – failed to respond to the company's attempts to contact her. In this instance, her failure to respond to Bausch & Lomb's request for information about returning to work or for documentation justifying an extension of her FMLA leave led to her termination.

36

At bottom, Ms. Hall's pretext argument seems to rest on her own belief that her termination was racially motivated. Such "bald allegations" are, however, "insufficient to counter substantial evidence of [a] legitimate, non-discriminatory reason[] for adverse employment action." *Nichols v. Comcast Cablevision of Md.*, 84 F.Supp.2d 642, 651 (D.Md. 2000) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)), *aff'd*, 217 F.3d 840 (4th Cir. 2000) (unpublished table opinion). Accordingly, summary judgment will be entered in Bausch & Lomb's favor on this claim.

### B. Ms. Hall's Breach of Contract Claim Must Be Dismissed Without Prejudice for Lack of Supplemental Jurisdiction

Bausch & Lomb has moved to dismiss Ms. Hall's breach of contract claim on jurisdictional grounds, contending that it is not sufficiently related to her employment discrimination claims and that supplemental jurisdiction over the claim is, therefore, lacking.[20] Although Ms. Hall presents other arguments about why the court should not enter judgment on her breach of contract claim, she has not addressed this threshold issue.

---

[20] Bausch & Lomb also moved for summary judgment on the merits of this claim. Because the jurisdictional issue is dispositive, however, the company's arguments for summary judgment need not be addressed.

When a district court's original jurisdiction over an action is based on federal questions in the complaint and the complaint includes both federal and state claims, the court "may exercise supplemental jurisdiction over the state claims if they form 'part of the same case or controversy' as the federal claim[s]." *Eriline Co., S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006) (quoting 28 U.S.C. § 1367(a)). State claims constitute "part of the same case or controversy" as federal claims when they derive from "'a common nucleus of operative fact' such that the plaintiff would ordinarily be expected to try the claims in one judicial proceeding." *White v. Cnty. of Newberry, S.C.*, 985 F.2d 168, 171 (4th Cir. 1993) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). Thus, although state and federal claims "need only revolve around a central fact pattern" to satisfy this test, *id.* at 172, supplemental jurisdiction "does not encompass claims [in which the state] count is separately maintainable and determinable without any reference to the facts alleged or contentions stated in . . . the [federal] count," *Hales v. Winn-Dixie Stores, Inc.*, 500 F.2d 836, 848 & n.12 (4th Cir. 1974).

Here, no common nucleus of operative fact exists between Ms. Hall's employment discrimination claims and her breach of contract claim. The claims "arise from two unique sets of

facts." *Lanford v. Prince George's Cnty., Md.*, 175 F. Supp.2d 797, 803 (D.Md. 2001).   The discriminatory treatment that Ms. Hall purportedly endured on the basis of her race and age is completely irrelevant to whether the company wrongfully refused to reimburse her for expenses she incurred on her corporate credit card.   Indeed, the only connection between the breach of contract action and the federal claims is "the general employer-employee relationship between the parties," a connection long deemed insufficient for supplemental jurisdiction.   *Lyon v. Whisman*, 45 F.3d 758, 762-63 ($3^d$ Cir. 1995) (citing *Hales* with approval); *Nicol v. Imagematrix, Inc.*, 767 F.Supp. 744, 747-48 (E.D.Va. 1991) (concluding that the court lacked supplemental jurisdiction over a plaintiff's breach of contract claim where that claim stemmed from the employer's alleged non-payment of a commission and the federal claims involved sex discrimination and sexual harassment); *Mason v. Richmond Motor Co., Inc.*, 625 F.Supp. 883, 886-89 (E.D.Va. 1986) (reasoning that supplemental jurisdiction over a breach of contract claim was lacking where its only connection to the plaintiff's employment discrimination claim was the employer-employee relationship between the parties), *aff'd*, 825 F.2d 407 (4th Cir. 1987) (unpublished table opinion).   Because the court lacks supplemental jurisdiction

over Ms. Hall's breach-of-contract claim, it must be dismissed without prejudice.

**IV. Conclusion**

For the foregoing reasons, Bausch & Lomb's "motion for summary judgment" will be granted. A separate Order will follow.

                                    _____/s/_____
                                    DEBORAH K. CHASANOW
                                    United States District Judge